A. B. DAVIDSON v. McD. ARLEDGE et al.

*Boundary—Evidence—Estoppel.*

1. The map of a city or town, which is adopted and recognized by the municipal authorities as correct, is competent evidence to establish the location of a lot in the city.

2. In order to show title out of the State by a possession for thirty years, it is not necessary to show any privity between the different occupants.

3. Where there is a dispute as to the dividing line between two adjoining tracts, the acts and admissions of the adjoining proprietors recognizing one line as the true one, are evidence of its location when the line is unfixed and uncertain, but where it is well ascertained, such acts and admissions are not competent evidence either to change the line or to estop the party from setting up the true line.

4. *It seems,* that such acts will entitle the losing party to recover the value of the improvements he may have put on the land, in good faith.

5. The rulings made when this case was before the Court on a former appeal, (88 N. C., 326,) repeated and affirmed.

(*Davidson* v. *Arledge,* 88 N. C., 326; *Davis* v. *McArthur,* 78 N. C., 357; cited and approved).

CIVIL ACTION, tried before *Avery, Judge,* and a jury, at Spring Term, 1886, of MECKLENBURG Superior Court.

DAVIDSON v. ARLEDGE.

The following plat will explain the matter in controversy:

There was a judgment for the plaintiff, and the defendants appealed.

The facts fully appear in the opinion.

*Mr. John Devereux, Jr.*, for the plaintiff.

*Mr. Platt D. Walker*, (*Messrs. A. Burwell* and *Geo. E. Wilson* were with him on the brief,) for the defendants.

SMITH, C. J.   When this cause was before the Court on the former appeal, 88 N. C., 326, and the title to the same narrow strip of territory formed by the different locations

of the boundary line between lots numbered 78 and 79 was in dispute, it appeared that William E. White, under a deed from Daniel Asbury made in 1858, and conveying the four lots, 69, 70, 77 and 78, the upper half of the square, and under a deed from the administrator of R. E. Carson, made in 1861, and conveying lots 79 and 80, one fourth of the square, became the owner of both lots 78 and 79 and the different antecedent locations of their divisional line ceased to be the subject of controversy.

Upon his death, and under a power contained in the will, his executor in May, 1869, conveyed to the plaintiff the four lots constituting the upper portion of square No. 10, and designated as being in the city of Charlotte "on the plan thereof;" and in June, 1870, the executor conveyed to the defendants "that portion of lots numbers 79 and 80, fronting on College street, and running back 80 feet to the line of the dower of Mrs. Carson; thence with said dower line to the line of the lots of A B. Davidson; thence with his line 80 feet to College street; thence with College street 198 feet to the beginning."

The solution of the controversy then, was to be found in ascertaining the location of the plaintiff's lot, number 78, for to its line that of the defendant came, and recognizing it, proceeded along that line to College street.

There could be no overlapping nor any color of title to support a possession of such supposed overlapping territory. Such were the facts before us in the former appeal.

Upon the trial now under review, the defendant, so far as the record shows, offered no documentary evidence of title in himself, other than that of possession, and resisted the plaintiff's recovery upon the ground that he had shown no title in himself to lot number 78, and could not therefore maintain the action.

The plaintiff offered in support of his claim of property the following deeds:

I. A deed from George Augustus Selevyn, by Henry E. McCullock, to Abram Alexander and others, dated in 1767, and conveying to them as trustees of the town proposed to be laid off, 360 acres of land on Garrison Creek, a part of 100,000 acres, being lot number 3, not proved to cover that in dispute.

II. A deed from Thomas Polk, Jerry McCafferty, and William Patterson, "trustees and directors of the town of Charlotte," to Isaac Alexander and eight others named, designated therein as "president and trustees of Liberty Hall in the county of Mecklenburg, and their successors in office," for four lots in Charlotte "known as lots numbers 69, 70, 77 and 78, on the south side of Tryon street, beginning at a stake, running thence along the said street 12 poles front and 24 poles back, containing near two acres." This deed bears date January 14th, 1778.

III. A deed from Addie Osborne and John McNitt Alexander, for themselves and Isaac Alexander, Samuel McCorkle, Thomas W. McCaull, and James Hall, describing themselves as the "late president and directors of Liberty Hall College, Mecklenburg county," made May 5th, 1778, to Thomas J. Polk, conveying the same mentioned lots, "as known and designated in the plan of said town of Charlotte."

IV. A deed dated September 26th, 1826, from Thomas J. Polk to William J. Alexander, in which "the same lots as laid down on the map of Charlotte" are described.

V. A deed executed on August 16th, 1842, by the sheriff of Cabarrus county, to the Bank of the State of North Carolina, conveying the same lots in the description. There was no evidence given of his having any execution in his hands or authority to make the sale.

VI. A deed from the same Bank, dated August 15th, 1843, to J. A. Johnston, similarly describing by the same num-

bers and with like reference to the plan of the town, the subject-matter of the conveyance.

VII. A deed made by the grantee Johnston, "trustee of the Bank of the State of North Carolina," on October 26th, 1846, of the four lots by the same terms of description, to Thos. J. Grier.

VIII. A deed from the last named, executed to David Asbury, July 5th, 1848, "conveying the same lots as designated in the plan of said town, and as being the property formerly owned by said Alexander, and on which said Alexander lately resided;" referring, as we suppose, to the deed from Polk to William J. Alexander, before mentioned.

IX. A deed from said Asbury to William E. White, dated November 11th, 1858, in which the premises are described in the same terms, except in substituting the name of said Asbury in place of that of Alexander, as the present occupant.

X. A deed from White's executor, dated May 22d, 1869, to the plaintiff, conveying "lots numbers 69, 70, 77 and 78, in square number 10 as known and designated in the plan of the town of Charlotte, being the property on which the testator lived at the time of his death."

XI. The plaintiff further introduced the will of said White, bearing date July 22d, 1869, in which authority is conferred upon his executor to sell whatever land he owned.

He also exhibited a map or plan of Charlotte, now become a city, and proved by Frederick Nash, for fifteen years past its clerk and treasurer, its official recognition as such by the authorities of the city. This map was made by James Parks, presented to and adopted by the commissioners, and approved by the intendent, as a correct representation of the plan. T. J. Orr, a surveyor, testified to his having run and measured the lines from the intersection of Trade street with Tryon and College streets, down to Fourth street, thence to Third street, and so continuing along Tryon street 198 feet.

The distance run from the two starting points was 396 feet to Fourth street, then allowing 22 feet as its width, 396 feet to Third street, then allowing 22 feet as its width, 198 feet as aforesaid. In like manner, the line was run and measured on College street, until a point was reached on square No. 10, 198 feet from Third street. These *termini* were then connected by a line which bisects the square. This forms the divisional boundary, as claimed by the plaintiff, between lots 70 and 71, and between lots 78 and 79; that this location of the lots and streets corresponds with the map of the city, and leaves the disputed territory within the limits of lot 78.

The witness stated that he found a plank fence on College street, 18 feet north of his central line, on each side of which, extended towards Tyron street, was a house, one on the north from 4 to 10 feet distant from the fence; the other on the south, from 6 to 7 feet distant, and through the middle of it the line so run passed; and that if the fence be the boundary, lots 77 and 78 would have a frontage on College street of 180 feet, and lots 79 and 80, a frontage on the same street of 216 feet. Another witness, A. J. Caldwell, who acted with the preceding witness in making the survey, gave similar evidence about the running of the lines, and stated that Second and Third streets have been made wider since they were originally laid out, the former 4 and the latter 12 feet, taken from square 121, and for this change an allowance was made in conducting the survey; that the disputed line, as made on his map, is north-east of the central line, and between it and the dotted line as shown in the map; that the distance from the terminus of the dotted line to Third street, is 180 feet, to Second street 212 feet, and to the line of Second street, before it was divided, 216 feet, thus forming a square.

On cross-examination, he testified to finding the defendant's fence at the dotted line, as far back as 1879, with houses

12

on either side, within a few feet, whereof the plaintiff had possession of one and the defendant of the other, while the line claimed by the plaintiff would cut defendant's house in two parts. His further testimony was about the conformity of the streets to the map, wherein they are laid down, and it is not necessary to recapitulate it.

The plaintiff, now 78 years of age, examined on his own behalf, stated that he has known the lots in square 10 since 1835. That William J. Alexander then lived on the property now occupied by himself; then David Asbury, and he was succeeded by William E. White; that witness bought at the sale made by the executor in 1865, and has had possession ever since; that lots 71, 72, 79 and 80, were occupied from 1835 to 1840 by Marshall Polk, in 1840 by him or Dr. Caldwell, and in that year by R. C. Carson, and thence up to his death in 1857, and afterwards by his widow and heirs at law, until 1861, when they passed into the possession of Dr. Gregory, who had married Carson's widow; that in 1865, the executor of White had possession of the land claimed by defendant, then a clover lot, and had a stable and privy upon it; that according to his memory, there was not any fence there in 1835, running across the square where Alexander lived then, nor does he know that the latter had a garden on the premises; that when Asbury occupied it, there was a fence between lots 78 and 79, and so it was when witness entered into possession. It was an old fence, but while witness believes it was not on the same line as the last fence, he cannot undertake to say how the fact is, but while he has repaired it, he has never constructed a new fence.

It was admitted that the defendant had been in possession of the disputed land since 1871.

We pass over the objection to the admission of the sheriff's deed and the plan of the city, with the remark that it lies not to the introduction of the deed, but its effect, unsupported by proof of his possession of legal authority to make the

sale and conveyance, and to its harmlessness as an offered monument of title, and say the map thus authenticated was most clearly competent in ascertaining locations.

1st Exception : The defendant proposed to inquire of the plaintiff, in the course of his examination, if the defendant did not, in 1871, with knowledge and without objection from the witness, build a house between the straight and dotted lines, as tending to show the position of the true line, and second, as an estoppel on the plaintiff now to contest it. This, on objection, was ruled out.

He again proposed to show, and for the same purpose, that in 1872, the defendant moved a house from some other part of the lot, near to the fence in the dotted line, and that it having slipped on the skids, and gone beyond the fence, the plaintiff required its removal back to defendant's side of the fence, which was done; but being in a position that the water dripped on plaintiff's side of the fence, he was required to move it still further on plaintiff's side, and that thereafter the defendant erected a valuable house near the fence, with plaintiff's knowledge and acquiescence. This was also ruled out as incompetent.

The plaintiff asked for the following instructions, which were given :

I. That the fact that Julius Alexander and Asbury held up to the fence on the line claimed by the defendant, is not evidence for them to consider in determining where the three lines of lot No. 78 were, as laid down in the map of the city in 1860, when the deed to the plaintiff was made.

II. That the line to be ascertained by the jury, is the boundary line between lots Nos. 78 and 79, as laid down on the map of the town of Charlotte.

III. That if the jury shall find that the land in controversy lies within the bounds of lot No. 78, as designated in the map or plan of the town of Charlotte, then they must find the first issue for the plaintiff.

The defendant asked for the following instructions:

1. That in order to recover, the plaintiff must show a title derived from the State, with which he must connect himself, which he has failed to do in this case, or he must show title out of the State, and seven years' adverse possession of the land in dispute under color of title

2. That the plaintiff has shown no adverse possession under color of title of the *locus in quo.*

3. That if the jury find that the line contended for by the plaintiff, is the line called for in the deed of White to the plaintiff, then the possession of a part of the land conveyed by his deed, would not be a possession of the *locus in quo*, provided there was an actual adverse possession of the *locus in quo* by some one else.

4. That the burden of proving where the true line between lots Nos. 78 and 70 is, is upon the plaintiff, and if the jury are in doubt as to its true location. the defendant is entitled to a verdict.

5. That upon all the testimony in the case, the plaintiff is not entitled to recover.

The second and fifth prayers for instructions by the defendant were refused, and the others were also refused, except as they were included in the general charge of the Court.

The defendant also asked his Honor to instruct the jury:

6. That even if the jury should locate the line between lots 71 and 70, as claimed by the plaintiff, yet if they find that in the year 1840, and from then on to 1861, when lot No. 79 was sold by Wilson, administrator, to White, R. C. Carson and others claiming under him, held actual, continuous, notorious and adverse possession of the land in dispute up to the fence, the plaintiff cannot recover, and they should find the issue submitted in favor of the defendant.

His Honor responded to this instruction as set forth in his general charge to the jury.

His Honor charged the jury as follows:

1. The burden is on the plaintiff in this action, to show by a preponderance of testimony, that he has title to the land described in the complaint, and if the plaintiff has not satisfied the jury by a preponderance of testimony that he is the owner and has the title, the jury will respond to the first issue, "no."

If the plaintiff has so satisfied them, they will respond "yes" to the first issue.

2. In actions for possession, the plaintiff may show title in himself by a connected chain of title from the State, or from the Sovereign of the British Empire before the date of our independence; or the plaintiff may show the title out of the State, and possession under color of title for seven years; or without exhibiting a title from the State or Sovereign, may show continuous adverse possession under color of title for twenty-one years; or after showing title out of the State by thirty years' actual possession, the plaintiff may show continuous adverse possession in himself and those under whom he claims, for twenty years before the action was brought.

3. If both lots, Nos. 78 and 79, have been shown to have been enclosed and occupied by any person for thirty years, prior to the 28th of January, 1880, when the action was brought, not counting the time between the 20th of May, 1861, and the 1st of January, 1870, the law presumes from such possession, that a grant has been issued by the State. It is not necessary that the persons holding possession of either or both lots should have claimed under the same right, or should have been in privity. Such possession would be sufficient to raise a presumption of a grant as to the *locus in quo*, if it is shown to have covered both lots (Nos. 78 and 79), whether in different persons or the same person, continuously from 1835 to the bringing of this action, even though the possession of the *locus in quo* was ad-

verse to the plaintiff, after the plaintiff entered in 1865, and up to the bringing of this action in 1880.

4. If the evidence raises a presumption that a grant was issued, and if the plaintiff has satisfied the jury by a preponderance of evidence, that lots Nos. 78 and 79 was each enclosed and held continuously in possession from 1835 till the former (No. 78) was conveyed to W. E. White by Asbury in 1855, and until the latter was conveyed to W. E. White by Carson's administrator in 1861, and that White and his executors held continuous possession of each of said lots from the time it was conveyed to him, till lot No. 78 was sold to the plaintiff in 1865 by said executor, then the plaintiff has shown continuous possession in himself and those under whom he claims, for twenty years, of the land described in the complaint, and the jury should respond to the first issue, "yes."

5. The burden is also on the plaintiff, to show that the defendant was in the wrongful possession of the land in controversy when the action was brought, and if the plaintiff has shown title in White, and *prima facie* to lot No. 78 in himself, he must still satisfy the jury in the same way, that the line of lot No. 78 runs according to the plan of the city of Charlotte, as recognized by the constituted authorities of the town, on the 22d day of May, 1869, including some portion of the land in controversy. If the jury find that the line of lot No. 78 so run, included any portion of the land south of the dotted line (fence) as laid down on the plot, (supposing they have responded "yes" to the first issue,) then they will respond "yes" to the second issue; otherwise, "no."

6. The Court is asked to charge the jury, that if the line of lot No. 78, run according to the plan of the city made in 1855, includes the *locus in quo*, and the *locus in quo* was in the adverse possession of R. C. Carson and those under whom he claimed, from the year 1835, till Carson's admin-

istrator conveyed to William E. White in 1861, then the plaintiff has not shown title to the *locus in quo,* good against the heirs at law of R. C. Carson.

The Court instructs you, that in order to maintain this proposition, the burden would be upon the defendant, to show by a preponderance of testimony, that a title by actual possession matured in R. C. Carson or his heirs at law in 1861, or prior thereto, and that the line of lot No. 78 included the *locus in quo,* not only subsequent to the making of the map of the city in 1855, but for twenty years prior to the 3d day of May, 1861, and no evidence has been offered by either of the parties to locate the lines of said lot prior to 1855.

The jury found the issues in favor of the plaintiff.

It will be observed that every deed introduced in support of the plaintiff's title, except the earliest, which conveys 300 acres not shown to include the land in dispute, from that of the trustees and directors of the town of Charlotte to Isaac Alexander and others, undertakes to convey the four lots claimed by the plaintiff, designating them by numbers, and as being in Charlotte ; and, all but the first, locating them according to the plan of said town. The survey made and accepted in 1855, as the town *then was,* and as presumed to have been originally laid out, except as intervening changes may have been made in widening the streets, as testified by the surveyor Caldwell, shows the disputed territory to be within the boundaries of lot 78.

While the title is not traced continuously and without interruption in these conveyances, they nevertheless, as evidence of asserted property in those who made them, show that the lots thus numbered and with defined lines, have been known as such for more than a century.

If then, the property in them has vested in the plaintiff, its extent is measured by the lines that enclose it, except as

some other person has acquired a part by such possession and so prolonged, as to operate as a legal transfer.

The testimony of the plaintiff as to the possession, commencing in 1835, of the lots as separated by the divisional line across the square, by the different claimants without the aid of antecedent deeds, was properly left to the jury, and warrants the verdict that the title of the State thereto had become divested by the presumption of the issue of a grant, for to effect this, it was not necessary to show a privity in estate of the successive occupants. *Davis* v. *McArthur*, 78 N. C., 357.

The succession of the deeds, from that of the sheriff to the Bank, in August, 1842, down to that to the plaintiff, is unbroken, and the plaintiff testifies that William J. Alexander, who held the deed of Thomas J. Polk, made in 1826, was in possession of the lots, now in his own occupation, in 1835, and after Alexander, it was in possession of Asbury and White and witness.

The possession of Asbury, under his deed from Grier, executed in July, 1848, until he conveyed to White in November, 1858, more than ten years, would put the title in him, without the aid of White's continuance of possession afterwards.

In like manner, the lots 71, 72, 79 and 80, were proved to be occupied from 1835 to 1840, by one Marshall Polk, in that year by him or Caldwell, and then by Carson, until his death in 1857, and thereafter by his widow and her second husband, Gregory. The interest of Carson was transferred by the deed of his personal representative, in May, 1861, to the before-mentioned William E. White, and are therein described as " being in the town of Charlotte, and known as lots Nos. 71 and 72, fronting on Tryon street, and Nos. 79 and 80 back, being the lots on which the late R. E. Carson lived at the time of his death," &c. Under this color of title, the

possession of Carson to his death in 1857, would perfect it in him. But as such color, the deed would enure to his benefit up to and not beyond the boundaries of the lots as fixed in the plan of the town.

Thus the title to both sets of lots was in White at his death, and his executor's prior deed of four of them to the plaintiff, and his posterior deed of the others to whomsoever made, of which no proof seems to have been offered at the trial, like its retention by himself, would be in subordination to the calls of that of the plaintiff.

Whatever divisional line might have resulted from previous long use and occupation, and the presumption thence arising, it is manifest that the plaintiff has acquired all the territory embraced in lot 78, as ascertained by reference to the plan and map of the city. Thus the controversy returns to the same position in which it was presented in the other appeal, and must be similarly solved.

The facts proposed to be proved, and ruled out, were, for reasons given in the former opinion, incompetent for the purposes indicated, since the line, if any, produced by occupation and acts of ownership, was obliterated by the union of the title to each in White, and his executor's deed must be construed by the descriptive words of the subject-matter contained in it. The rejected evidence would have been competent to fix an uncertain and controverted boundary, but not to *change* that made in the deed that distinctly defines it.

As an estoppel, it could not operate to vary the position of the dividing line, as determined by the grantor, who owned both lots, whatever equitable claim might thence arise as to the increased value imparted to the premises by reason of the improvement. Without going into a needless repetition (and the case has already been protracted in the examination and discussion,) we deem the appellant's exceptions disposed of

substantially in our former ruling, and find no reason to disturb the verdict and judgment of the present trial.

The judgment is affirmed.

No error.                                                    Affirmed.